IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ALI AL HILALI, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    Case No. 4:14-cv-01120-NKL |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner | ) |
| of Social Security, | ) |
| | ) |
|     Defendant. | ) |

**ORDER**

Plaintiff Ali Al Hilali appeals the Commissioner of Social Security's final decision denying his application for disability insurance benefits and supplemental security income. The decision is reversed and the case remanded.

**I.  Background**

The relevant alleged disability period for purposes of the present appeal is July 1, 2006, Al Hilali's date of alleged onset, through August 27, 2013, the date of the ALJ's decision.

Al Hilali was born in 1971. He grew up in Iraq and has a ninth-grade education. He was drafted into the Iraqi army in 1989. He later sought political asylum in Saudi Arabia, but was sent to a prison camp where he was held for six years and tortured. He came to the United States in 1996.

**A.  Back pain**

Al Hilali first hurt his back when he fell in 1991 in the prison camp. He had no treatment and had to lie down for three months. In 2001 or 2002, he began having pain that radiated down his legs and interfered with his ability to work. A 2009 MRI of his back showed posterior annular tears and mild circumferential disc bulges causing mild spinal canal stenosis and

neuroforaminal narrowing at L3 through S1. Straight leg raise testing showed pain, but not shooting pain. Pain medication was prescribed.

In July 2011, Al Hilali saw a doctor after running out of pain medication. He complained of sharp lower back pain, worse after standing 30 minutes, better after sitting or bending forward. He said his new job required him to stand for four hours, three to five days a week. The doctor refilled his pain medications. In November 2011, he returned to the doctor, reporting his back pain was worse in the last four months, and radiating down his right lower leg. The straight leg raise test was positive at 30 degrees. The doctor refilled a pain medication prescription, and recommended a pain clinic consult. Al Hilali went back to the doctor in November, reporting that the pain medication was not working, and it was switched. The doctor recommended physical therapy but Al Hilali could not afford it. The doctor arranged an orthopedic consult for possible epidural steroid injection. Though a cane had not been prescribed, Al Hilali bought and began using one.

At a doctor visit in March 2012, Al Hilali reported his back pain medication was not working, and it was changed. On April 13, 2012, he was hospitalized for almost three weeks for surgery relating to his stomach problems. He was discharged on May 2, 2013, and readmitted through the emergency room the same day because of severe vomiting. During that readmission, he had back pain, and CT scans of his lumbar and thoracic spine were performed on May 16, 2012. The CT of the lumbar spine showed mild disc space narrowing primarily at L3-L4 and L4-L5, and broad-based disc herniation at L4-L5 with at least mild spinal canal stenosis at the same level. The CT of his thoracic spine showed mild multi-level facet arthrosis and right basilar airspace disease.

In July 2012, Al Hilali went to the emergency room because of back pain and received an injection. The next day, at a general surgery follow-up appointment, he complained of low back

pain that had worsened after picking up a plate from the floor three days earlier. He said the injection he received in the emergency room had only partially relieved the pain. He was prescribed new pain medication. An MRI showed progression of the L4-L5 disc bulge, with central protrusion causing moderate spinal stenosis.

In September 2012, Al Hilali followed up with his primary care doctor with worsening back pain. He reported that a few weeks earlier, he had been unable to get out of bed. The doctor noted Al Hilali was avoiding taking one of his pain medications because of side effects relating to his stomach. The straight leg test was positive on both the left and the right. The doctor referred him to the pain clinic for possible interthecal steroid injections, and to the neurosurgery clinic for a second opinion. At the neurosurgery consultation, he was diagnosed with lumbar spinal stenosis with probable neurogenic claudication. A couple of days later, Al Hilali went to the emergency room with sudden onset of severe low back pain radiating down both legs, and he was readmitted to the hospital. He had a surgical consultation, and was prescribed a Medrol Dosepak, but did not want surgery. An MRI of the lumbar spine showed large central disc protrusion at L4-L5 resulting in severe spinal stenosis, and an annular tear at L5-S1. At the pain clinic consultation, he had a positive straight leg test on both sides, and was administered an epidural steroid injection.

Al Hilali followed up for back pain with his primary care doctor in November 2012. He said he was scared of back surgery because of all the complications he had had after stomach surgery. He was continuing to use the cane. He said that when his pain reaches 10/10, he cannot get out of bed. The doctor referred him for another neurosurgery consultation.

At the neurosurgery consultation in December 2012, examination showed limited range of motion secondary to pain. Deep tendon reflexes were 2/4 on both sides, and Al Hilali had

3

marked tenderness over the L4-L5 region. Surgery was recommended, but he opted to try further epidural steroid injections.

In January 2013, Al Hilali followed up at the primary care clinic for worsening back pain, as well as nausea. Straight leg testing was positive on both sides. The doctor attempted to find a pain management clinic to see him, in view of his insurance issue. In April 2013, a pain clinic still had not yet been found, and Al Hilali went to the emergency room for back pain.

**B. Stomach problems**

Al Hilali had an esophagogastroduodenoscopy (EGD) in January 2011, which showed grade 3 reflux disease, Barrett's esophagus, a small hiatal hernia, and benign duodenal stricture. At a follow up the next month, the doctor prescribed Zantac and scheduled a repeat EGD. In July 2011, a repeat EGD showed reflux esophagitis and benign duodenal stricture. In September 2011, a third EGD showed squamous and glandular epithelium with features of chronic inflammation.

He had a consultation in January 2012 relating to nausea, vomiting, and reflux. The doctor's impression was benign duodenal stricture and severe reflux, and studies were ordered. A February 2012 upper GI exam showed very high grade duodenal stenosis and stricture, and a study of Al Hilali's gastrin level was planned. Due to his repeated duodenal stricture and GERD, in April 2012 Al Hilali underwent an exploratory laparotomy with open duodenal biopsy, truncal vagotomy, and loop gastrojejeunostomy. His postoperative diagnosis was grade-three GERD with duodenal stricture, and chronic esophagitis with endoscopic findings suggestive of Barrett's disease. He was discharged after 19 days, on May 2, 2012, but returned to the emergency room the same day with severe vomiting, and was readmitted with a diagnosis of paralytic ileus. He was hospitalized for 20 days.

At general surgery follow-ups in June 2012, his nausea and vomiting were improved. He was vomiting about once per day or every other day. Zofran was prescribed for nausea, and he was instructed to eat smaller, more frequent meals.

In August and September 2012, Al Hilali complained of nausea and vomiting, and weight loss. A gastric emptying study performed in November 2012 showed markedly delayed gastric emptying time, likely related to gastroparesis. An upper GI performed in December 2012 showed patent gastrojejeunal anastomosis without evidence of stricture, and 80% narrowing of the distal first portion of the duodenum.

Al Hilali complained of worsening nausea in January 2013, and was prescribed Zofran and Reglan, but had little improvement. In March 2013, he went to the emergency room because of nausea and abdominal pain.

### C. Other treatment

Al Hilali began treatment at Truman Behavioral Health in May 2011 for problems relating to post traumatic stress disorder. His diagnoses eventually included PTSD and major depressive disorder. Through at least March 2012, he continued to receive psychotherapy, and also saw a psychiatrist who prescribed and adjusted various medications. In a March 2012 entry, the psychiatrist noted Al Hilali was "very compliant with psychotherapy and working very hard at it." [Tr. 498.]

### D. Al Hilali's testimony, self-reports, and employment history

Near the beginning of the hearing of May 22, 2013, the ALJ asked Al Hilali whether he understood and spoke English, and he answered, "Not very well." [Tr. 30-31.] The ALJ then asked him whether he had understood what the ALJ had said so far, and Al Hilali said he had. [Tr. 30.] An interpreter participated in the hearing as needed, generally helping with longer or more complex questions posed to Hilali, and narrative answers provided by him.

Hilali testified that he came to the United States in 1996, married, had two children, separated from his wife, and now lives with his children, who are 10 and 11. He lives in a street-level apartment, and his bedroom is upstairs. He lies down when he is at home, and his sister-in-law comes over to take care of the children, cook, and do housework three to four times a week. He and his children have also had to live with her "many times…, about three to four months…when my back is hurt so much." [Tr. 63-64.] When he feels "strong a little bit" he will "stand up [and] take care of the kids and the…apartment[.]" [Tr. 57.] He cannot sit for more than an hour at a time. He never tries to lift or carry because the last time he tried to lift about ten pounds, he hurt his back and had to lie "on the bed about two months." [Tr. 58.] His back pain affects the way he walks. [Tr. 60.] He has a driver license and drives three to four times a week, to take his children somewhere or sometimes to go to the grocery store. When he goes to the grocery store, his sister-in-law goes with him to help. He began using the cane at the end of 2011 or in 2012, testifying that he sometimes cannot walk without it. [Tr. 48.] He cannot afford physical therapy, and cannot take much pain medication for his back because it worsens his stomach problems. He is afraid of having back surgery, because of problems he had with his 2012 stomach surgery.

Hilali testified that his stomach problems cause nausea, vomiting, and pain in his stomach; caused him to lose weight; and can prevent him from eating. He has taken different medications and they have not resolved all symptoms. He was hospitalized for 40 days in 2012 in connection with stomach surgery, which he testified was not successful and worsened some symptoms. His doctor told him he is in the one percent of persons with such stomach problems that cannot be entirely corrected with surgery and other treatment. He has had to cancel some mental health appointments because of stomach pain and nausea.

He has nightmares and depression relating to the time he was in the prison camp, and

6

depression relating to issues with his wife, from whom he is separated. He has used different psychotropic medications and had therapy, which help.

Before 2001, Al Hilali was employed full time, doing jobs such as bakery helper, hand packer, and car part cleaner and polisher. From 2001 until about December 2012, he was self-employed off and on, part time, doing odd jobs such as cleaning parking lots.[1] He would use a shovel for snow removal, though he did "not [lift] a lot of snow," and pushed a broom and picked up paper. [Tr. 41.]

Al Hilali stated in his Adult Function Report, prepared 1/12/2012, that he takes his children to school and picks them up, watches television, helps his children with homework, makes sandwiches, helps with laundry and housecleaning, and drives. He stated he used to work full time, and now works when feels good, and stays home and rests when he does not. He stated that family members help him with cooking, shopping, cleaning, and taking care of the children. [Tr. 206-216.]

**E. Expert reports**

On March 19, 2012, agency medical consultant Stephen S. Scher, Ph.D. completed a medical records review. In Dr. Scher's opinion, Al Hilali retained the functional ability to perform the following functions: (1) understand, remember, and carry out simple to moderately complex instructions requiring brief learning periods; (2) concentrate and persist at familiar tasks requiring some independent judgment and involving only minimal variations; (3) interact with supervisors and peers where intensive interaction is not required with only occasional significant interaction with the public; and (4) adapt to situational conditions and changes with reasonable support and structure. [Tr. 80.] The ALJ gave significant weight to Dr. Scher's opinion. [Tr. 19.]

---

[1] Al Hilali's self-employment earnings did not constitute substantial gainful activity.

7

On April 7, 2012, Dennis Velez, M.D., performed a consultative examination of Al Hilali at the request of the Disability Determinations Section, and prepared a written report. [Tr. 405-415.][2] Dr. Velez noted a slow and steady gait, and that Al Hilali "did present with an assistive device and was able to walk around the exam room without it." [Tr. 408.] Under the "Physical Exam" section, Dr. Velez stated in part:

> MUSCULOSKELETAL:
> No joint swelling, erythema, effusion or deformity. He had tenderness to palpation in the lumbosacral region. The claimant was able to lift, carry and handle light objects. The claimant was unable to squat and rise from that position. The claimant was unable to rise from a sitting position without assistance and had difficulty getting up and down from the exam table. The claimant was unable to walk on heels and toes. Tandem walking was normal and the claimant could stand but not hop on either foot bilaterally. The claimant can dress and undress adequately well but was mildly cooperative and did not give good effort during the examination. Range of motion was decreased in the following areas: Right Shoulder: flexion 120 degrees. I was unable to assess range of motion of the back secondary to claimant's refusal to perform the maneuvers. Range of motion was within normal limits in all other areas including cervical, elbows, left shoulder, wrists, hands, hips, knees and ankles/feet.

[Tr. 408-409.] At the end of the Physical Exam section, under "Diagnosis," the doctor noted "Back pain, unknown etiology and depression." [Tr. 409.] The doctor concluded the written report as follows:

> IMPRESSION:
> From the allegation of the lower back injury, on my examination, the claimant did not have any neurological deficits and his range of motion could not be fully assessed as the claimant stated that he has significant pain. He cooperated with some maneuvers after much convincing and range of motion in his thoracolumbar region as well as lateral flexion and extension could not be assessed fully. The claimant did provide a history but would not cooperate with some maneuvers as well as some other questions such as his ability to walk and stand because according to him, he was in too much pain and needed to go.

---

[2] Neither Dr. Velez's report nor any other part of the record reflects the doctor reviewed Al Hilali's medical records.

8

> From the allegation of depression, claimant's mood seemed appropriate and I saw nothing that would indicate depression based on my conversations with him.
>
> The claimant came accompanied by an interpreter who was present during examination.
>
> Based on my examination it was difficult for me to ascertain what kind of functional limitations he would have. He certainly can communicate very well in his native language and does understand some English and as far as I can tell, he does not have any barriers to written communication. However, my ability to determine whether he can lift, carry, bend, crouch, and stoop is limited by the fact that he was in a lot of pain. It may be that the claimant needs to be optimized medically before I can reexamine him or that maybe imaging needs to be done to see if there is a significant pathological process that prevents him from fulfilling of these maneuvers.
>
> PROBABLE DIAGNOSIS:
> 1-Back Pain

[Tr. 409-410.] The ALJ did not expressly give any weight to Dr. Velez's report, because the doctor "could not provide an opinion[.]" [Tr. 19.]

**F. Decision**

The ALJ found that during the relevant period, Al Hilali had severe impairments of depression, post-traumatic stress disorder, degenerative disc disease of the lumbar spine with disc herniation and spinal stenosis, and a gastrointestinal impairment. [Tr. 13.] Al Hilali did not claim to meet any Listings, and the ALJ did not find that he met any.

The ALJ found Al Hilali has the residual functional capacity to perform:

> [S]edentary work as defined in 20 CF'R 404.1567(a) and 416.967(a) and SSR 83-10, in that he can lift ten pounds frequently and occasionally, sit for up to six hours in an 9-hour [sic][3] workday, and stand or walk for up to two hours in an 8-hour workday, so long as allowed to alternate sitting and standing positions at least every thirty minutes. He can

---

[3] The Court assumes the reference to "an 9-hour workday" is a typographical error, and that the ALJ meant an 8-hour workday.

> occasionally climb ramps and stairs but never climb ropes, scaffolds and ladders. He can occasionally stoop, but never kneel, crouch or crawl. He should avoid extreme cold and excessive vibration. He is limited to simple, routine, repetitive work with only occasional public contact. He can work around co-workers but with only occasional interaction with co-workers.

[Tr. 15.] The ALJ found Al Hilali's allegations were not entirely credible.

The ALJ determined Al Hilali was not capable of performing past relevant work, but was capable of performing other jobs that exist in significant numbers in the local and national economy, such as final assembler, optical goods; ampule sealer; and lens inserter, optical goods.

## II. Discussion

Al Hilali argues that the RFC and the credibility finding are not supported by substantial evidence on the by the record as a whole.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A. Formulation of the RFC

Residual functional capacity is what a claimant can still do despite physical or mental limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). An ALJ must formulate the RFC based on all of the relevant, credible evidence of record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.")

(*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of his limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove his or her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

Al Hilali argues that the RFC does not account for his limitations related to pain and that Dr. Velez's observations do not constitute substantial evidence. The ALJ found Al Hilali could lift ten pounds frequently and occasionally, and sit for up to six hours and stand or walk for up to two hours in an 8-hour workday, so long as allowed to alternate sitting and standing positions at least every thirty minutes. The ALJ further found Al Hilali can occasionally climb ramps and stairs but never climb ropes, scaffolds and ladders; and can occasionally stoop, but never kneel, crouch or crawl. The findings are not supported by substantial evidence.

The ALJ relies heavily on statements in Dr. Velez's report as support for the portion of the RFC concerning Al Hilali's physical abilities. [Tr. 16, 18-19.] But, as the ALJ expressly acknowledged, Dr. Velez did not form an opinion about Al Hilali's physical abilities. [Tr. 19.] The ALJ did give "significant weight" to the opinion provided by the other consulting expert, Dr. Scher, but Dr. Scher's opinion did not address physical abilities. [*Id.*] An ALJ must fully and fairly develop the record, and may not simply draw her own inferences about a claimant's functional ability from medical reports. *See Godoua v. Colvin,* 564 Fed. Appx. 876, 878 (8th Cir. 2014) (*citing Snead v. Barnhart,* 360 F.3d 834, 838 (8th Cir. 2004)), and *Strongson v. Barnhart,* 361 F.3d 1066, 1070 (8th Cir. 2004).

Furthermore, the ALJ picks and chooses from Dr. Velez's statements. For example,

11

the ALJ states Dr. Velez observed Al Hilali "was walking adequately without the assistance of [his] cane[.]" [Tr. 18.] But the ALJ does not note that the observation was limited to Al Hilali's "[ability] to walk around the exam room[.]" [Tr. 408.] Nor does the ALJ acknowledge Dr. Velez's observation of Al Hilali's other limitations on ambulation and leg movement, such as "[inability] to walk on heels and toes[,]" "hop on either foot bilaterally[,]" "squat and rise from [the squatting] position[,]" or "rise from a sitting position without assistance[,]" and "difficulty getting up and down from the exam table." [Tr. 408-409.] The ALJ also overlooks the "Impression" portion of the report, in which the doctor acknowledges Al Hilali's pain as a possible source of at least some functional limitation:

> [M]y ability to determine whether [Al Hilali] can lift, bend, crouch, and stoop is limited by the fact that he was in a lot of pain.

[Tr. 409.]

The ALJ also points out Dr. Velez's remark that Al Hilali refused to perform some maneuvers, which the ALJ seems to assume meant Al Hilali was simply malingering. Given the doctor's acknowledgment of Al Hilali's pain, noted above, the ALJ's assumption is not supported by substantial evidence. A person may "refuse" to perform a physical activity for a variety of reasons, including pain, or malingering. And here, in the Impression portion of the report, Dr. Velez accepted that Al Hilali was limited in at least some respect by "a lot of pain." [*Id.*]

Furthermore, the ALJ failed to note Dr. Velez's additional remark that Al Hilali

> may … need[] to be optimized medically before I can reexamine him or … maybe imaging needs to be done to see if there is a significant pathological process that prevents him from fulfilling these maneuvers.

[*Id.*] Dr. Velez's report is dated April 7, 2012. As demonstrated by the medical record, Al Hilali in fact had had imaging of his spine in 2009, which showed back problems. Straight

12

leg testing was positive in 2009. Dr. Velez did not review the medical records.

In any event, Al Hilali subsequently had imaging, testing, and treatment after his visit with Dr. Velez. The records show that Al Hilali's condition was deteriorating and had not been stable at the time he saw the doctor, which the ALJ failed to account for in determining the RFC. *See Bowman v. Barnhart,* 310 F.3d 1080, 1084 (8th Cir. 2002) (reversing denial of benefits, where ALJ failed to consider progressive nature of claimant's spinal impairments, among other things, and where the record showed, contrary to the ALJ's finding, that the claimant's condition had significantly deteriorated since she was laid off work); *see also McCoy v. Astrue,* 648 F.3d 605, 617 (8th Cir. 2011) (RFC determination must be based on the claimant's ability to perform the necessary physical activities day in and day out). Straight leg testing was positive in November 2011. A CT scan in May 2012 showed a worsening of Al Hilali's back condition since his 2009 MRI. He went to the emergency room for back pain in July 2012 and received an injection. An MRI the following day showed his condition had worsened since the April scan. He was hospitalized in September 2012 due to back pain, and an MRI showed his back condition had further deteriorated. A neurosurgery consultation in December 2012 showed limited range of motion secondary to pain, reduced deep tendon reflexes bilaterally, and marked tenderness over the L4-L5 region, and surgery was recommended. Al Hilali opted to try another epidural steroid injection. At a January 2013 primary care appointment, he complained of worsening back pain, and straight leg testing was positive on both sides. He was treated in the emergency room for back pain in April 2013. At the May 2013 hearing, a year after he saw Dr. Velez, Al Hilali testified he did not lift because the last time he lifted ten pounds, he hurt his back and had to lie down for two months. He testified that he lies down when he is at home, that back pain affects how he walks, and that he cannot take much pain medication for his back because it worsens his

13

chronic stomach problems. He has had to move in with his sister-in-law on occasion, because of his back pain, so that she could care for him and his children.

The RFC determination is not supported by substantial evidence on the record as a whole. Accordingly, the decision is reversed and remanded for an examination of Al Hilali by a consultant to whom the medical record is made available, and for further proceedings consistent with the above discussion.

### B. The credibility finding

Credibility is "primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009) (internal quotation and citation omitted). Thus, a reviewing court normally defers to an ALJ's credibility finding if the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010) (citation omitted), and when substantial evidence on the record as a whole supports the credibility finding, *Peña v. Chater,* 76 F.3d 906, 908 (8th Cir. 1996).

The ALJ did not find Al Hilali entirely credible, but did not give good reasons, nor is the credibility finding supported by substantial evidence on the record as a whole. The credibility determination rests in large part on the ALJ's interpretation of Dr. Velez's report and medical record, discussed above. In view of the reversal and remand for an examination and further proceedings consistent with that discussion, the credibility determination will have to be revisited on remand, and need not be addressed at length here.

The Court does note that an additional aspect of credibility determination was the ALJ's conclusion that Al Hilali was not "forthright" at the hearing when he "[gave] the initial impression that he was unable to understand or speak English, [but] further questioning revealed otherwise." [Tr. 18-19.] The ALJ explained that Al Hilali "utilized the assistance of an interpreter only when he provided lengthy narrative responses; otherwise, [he] testified

14

independently." [Tr. 19.] The ALJ also pointed out Dr. Velez's observation that Al Hilali "was able to understand some English, and there were no barriers to written communication." [Tr. 19.]

The hearing transcript reflects Al Hilali's statements at the beginning of the hearing that he did not understand English "very well," but that he had understood the proceedings up to that point. [Tr. 30-31.] The transcript also reflects that he called on the interpreter for assistance not only for help giving some narrative answers, but to interpret some questions he did not follow. The medical records show, in analogous fashion, that Al Hilali used an interpreter for some mental health and medical appointments, and some of his therapy appointments were canceled or cut short when an interpreter was not available. [Tr. 286, 316, 350, 481, and 734.] Although Dr. Velez noted Al Hilali had no barriers to written communication, Dr. Hilali's report does not indicate any basis for the statement. Furthermore, Al Hilali was not asked at the hearing before the ALJ to communicate in writing. Substantial evidence does not support an adverse credibility determination on the basis that Al Hilali was not "forthright" with the ALJ about his ability to communicate in English.

In view of the foregoing, the credibility determination is reversed.

### III. Conclusion

The Commissioner's decision is reversed and the case remanded for further proceedings consistent with this Order.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: August 26, 2015
Jefferson City, Missouri